UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONNA G. HALTON,            )
                           )
            Plaintiff,     )
                           )
      v.                   )      No.  4:09CV187 FRB
                           )
MICHAEL J. ASTRUE, Commissioner  )
of Social Security,        )
                           )
            Defendant.     )

**<u>MEMORANDUM AND ORDER</u>**

This cause is before the Court on appeal of an adverse ruling of the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636©.

## I.  Procedural History

On June 28, 2005, plaintiff Donna G. Halton filed an application for Disability Insurance Benefits (DIB) pursuant to Title II, 42 U.S.C. §§ 401, <u>et</u> <u>seq.</u>, in which she claimed she became disabled on January 1, 2003.  (Tr. 55-59.)  On initial consideration, the Social Security Administration denied plaintiff's claim for benefits.  (Tr. 23, 45-49.)  On November 28, 2006, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 248-60.)  Plaintiff testified and was represented by counsel.  A vocational expert also testified at the hearing.  On January 11, 2007, the ALJ issued a decision denying plaintiff's claim for benefits.  (Tr. 8-22.)  On July 3, 2007, the Appeals Council denied

plaintiff's request for review of the ALJ's decision. (Tr. 3-6.)
Plaintiff thereafter appealed the final decision of the
Commissioner to this Court. Halton v. Astrue, Cause No. 4:07CV1508
FRB (E.D. Mo. 2007). Upon motion of the Commissioner, the cause
was remanded for further consideration of plaintiff's claim.
Halton, Cause No. 4:07CV1508 FRB (E.D. Mo. Feb. 19, 2008) (Doc.
#19, Order).

In an Order entered March 13, 2008, upon remand, the
Appeals Council vacated the final decision of the Commissioner and
remanded the matter to an ALJ with instruction on how to proceed
with further consideration of plaintiff's claim. (Tr. 276-79.)
A supplemental hearing was held before an ALJ on August 27, 2008.
(Tr. 575-613.) Plaintiff testified and was represented by counsel.
A vocational expert also testified at the hearing. On November 28,
2008, the ALJ issued a decision denying plaintiff's claim for
benefits. (Tr. 261-71.) Plaintiff filed no written exceptions to
the Appeals Council regarding the ALJ's decision, and the Appeals
Council did not independently assume jurisdiction of the case
within sixty days of the ALJ's decision. As such, on this case
after remand by the district court to the Commissioner, the ALJ's
decision became final on January 28, 2009. 20 C.F.R. § 404.984.[1]

_____

[1]In the briefs filed by plaintiff and defendant in this cause,
as well as in the Orders entered by the Appeals Council on March
13, 2008, and the ALJ on November 28, 2008, reference is made to
subsequent applications for benefits filed pursuant to Title II, 42
U.S.C. §§ 401, et seq. (DIB), and pursuant to Title XVI of the
Social Security Act, 42 U.S.C. §§ 1381, et seq. (Supplemental
Security Income (SSI)). In his Order denying benefits, the ALJ

A.  Plaintiff's Testimony

At the supplemental hearing on August 27, 2008, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was forty-three years of age. (Tr. 578.)  Plaintiff stands five-feet, three inches tall and weighs 236 pounds.  Plaintiff is right-handed. (Tr. 579.) Plaintiff has a high school education and previously attended college. (Tr. 578.)  Plaintiff lives in a rural area. (Tr. 600.) Plaintiff lives on the lower level of a two-story home with her twenty-year-old son. (Tr. 595-96.)  Plaintiff does not receive Medicaid or food stamps, but was in the process of reapplying for Medicaid at the time of the hearing. (Tr. 591.)

Plaintiff's Work History Report shows plaintiff to have worked as a hairdresser from 1988 through December 31, 2002. (Tr. 91.)  Plaintiff testified that she has worked as a hairdresser on and off since 2005 on a part-time basis, and had to stop such work within the past year because of her medical conditions. (Tr. 580-

_____

noted those applications and the documents associated therewith to be joined to the case involving the instant application for DIB benefits.  (Tr. 264.)  The undersigned has reviewed the administrative record submitted with the defendant's Answer in this cause and finds it not to contain the subsequent applications referred to.  In her Complaint, plaintiff challenges the Commissioner's adverse decision as it relates to plaintiff's original application for DIB.  As such, the undersigned will proceed to address plaintiff's appeal in relation plaintiff's original application for DIB benefits, to which, apparently, her subsequent application for DIB benefits was joined.

82.)  Plaintiff testified that she last worked in June 2008 at a VFW hall, performing work as a cashier, bartender, kitchen worker, and cleaner, but that she could not continue with such work because of her medical conditions.  (Tr. 579-80.)

Plaintiff testified that she had had a bone deformity in her left foot and that in 2000 or 2001, she underwent reconstructive surgery with associated joint/ankle replacement.  Plaintiff testified that she also had surgery on her right foot by which fluid sacs were removed, and tendons and ligaments were repaired. Plaintiff testified that her foot impairments caused pain to shoot up her legs and into her back.  Plaintiff also testified that nerve conduction tests showed her to have poor circulation in her legs. Plaintiff testified that the surgery on her left foot helped her ability to walk, but that she has had severe pain since the surgery.  Plaintiff testified that she continues to have problems with her feet due to arthritis.  Plaintiff testified that she previously took medication for arthritis which significantly helped, but that she no longer receives treatment or takes medication due to lack of insurance. (Tr. 584-89, 601.)  Plaintiff testified that she is unaware of any free clinics in her area from which she could obtain medical services.  (Tr. 607.)

Plaintiff testified that she had arthroscopic surgery in 2005 to remove arthritis from her feet.  (Tr. 589-90.)  Plaintiff testified that she obtained benefit from this surgery for about one year, but then experienced burning pain up her legs and into her

- 4 -

back from the recurrence of arthritis.  (Tr. 590-91.)  Plaintiff testified that she was told to stay off of her feet.  (Tr. 591.)

Plaintiff testified that she also suffered from carpal tunnel syndrome for which she had surgery on the right hand prior to 2005.  (Tr. 589.)  Plaintiff testified that she continues to have reduced strength in the right hand and that she has arthritis in her fingers and knuckles.  (Tr. 594.)  Plaintiff testified that her left hand is very numb, that her fingers get cold, and that she experiences pain to her elbow.  (Tr. 592, 595.)  Plaintiff testified that she wears a brace on her left hand periodically during the week.  (Tr. 602.)  Plaintiff testified that she is unable to undergo surgery on the left hand because she does not have medical insurance.  (Tr. 592.)

Plaintiff testified that the condition in her knees and back has worsened during the previous year, and that she has difficulty with sitting and standing because of pain.  (Tr. 592-93.)  Plaintiff testified that she has been advised that the pain in her back is caused by degenerative joint disease.  (Tr. 593.)  Plaintiff testified that she has pain in the low back and stiffness from her shoulder blades to her neck.  Plaintiff testified that she has difficulty with sleep and wakes up with pain in her back and neck.  (Tr. 594.)

As to her exertional abilities, plaintiff testified that she can stand for up to thirty minutes.  (Tr. 593.)  Plaintiff testified that she has difficulty with balance, and falls a couple

of times each week. Plaintiff testified that she uses a cane on uneven terrain and in the morning when she feels stiff. Plaintiff testified that her gait is very slow. Plaintiff testified that she is able to bend to pick things up from the ground, but that it is very painful. (Tr. 603-04.) Plaintiff testified that she can write for only limited periods of time because of swelling of the knuckles of her right hand. (Tr. 595.) Plaintiff testified that she has difficulty gripping things. (Tr. 598.) Plaintiff testified that she can cut vegetables for a salad and is able to manipulate buttons on clothing. (Tr. 597-98.) Plaintiff testified that her ability to use her left hand is limited when she wears the brace. (Tr. 602.) Plaintiff testified that she can carry a gallon of milk because it has a handle, but would not be able to carry a ten-pound bag of potatoes. (Tr. 598-99.)

As to her daily activities, plaintiff testified that she watches television, reads magazines and talks on the telephone. (Tr. 600-01.) Plaintiff testified that she is not involved in any church activities or groups, except that she now goes to the VFW inasmuch as she has a son serving in the military in Iraq. (Tr. 600.) Plaintiff testified that she can go to the grocery store to pick up a few items, but that her son does the actual grocery shopping. (Tr. 593.) Plaintiff testified that she can do laundry because is it on the same level as her bedroom at home. Plaintiff testified that she does a limited amount of dishes, but not every day; and that she can vacuum, but not carry the vacuum up and down

the stairs. Plaintiff testified that she no longer cooks big meals because she cannot stand long enough to prepare them. (Tr. 596-97.) Plaintiff testified that she drives, but not for long periods of time because of back pain. (Tr. 599-600.)

Plaintiff testified that she could not perform the cashier work at the VFW because she could not continually stand for the position and could not repeatedly alternate between sitting and standing. Plaintiff testified that she could only perform the work for about two hours. Plaintiff also testified that the condition of her hands caused her to experience difficulty with operating the cash register and handling money. (Tr. 605-06.) Plaintiff testified that she became unable to cut hair professionally approximately one and a half years prior because of her hands and difficultly with her arms and shoulders. Plaintiff testified that she remained able to cut hair for family and friends because she did not have to be as precise as required for a commercial haircut. (Tr. 606-07.)

B.  Testimony of Vocational Expert

Vocational expert Lisa Keene testified at the hearing in response to questions posed by the ALJ and counsel.

The ALJ first asked Ms. Keene to assume that plaintiff could perform sedentary work and had no other limitations. Ms. Keene testified that, with her work background, plaintiff could perform work as a surveillance systems monitor, of which 2,000 such jobs existed in the State of Missouri, and 100,000 nationwide; as

a credit checker, of which 2,200 such jobs existed in the State of Missouri, and 55,000 nationwide; and as a document preparer, of which 600 such jobs existed in the State of Missouri, and 40,000 nationwide. (Tr. 608.) In response to the ALJ's question regarding hand usage, Ms. Keene testified that the job of document preparer required frequent hand usage; that the job of credit checker would require occasional hand usage; and that limited hand usage would not affect the job of surveillance system monitor. (Tr. 608-09.) Ms. Keene testified that the number of sedentary jobs with restricted hand usage was very limited. In response to the ALJ's question regarding sedentary work with no limitations on hand usage, Ms. Keene testified that available jobs would include cashiering, production, assembling, packing, clerical, and telephone operator, and that such jobs would require full use of the hands. Ms. Keene further testified that difficulty with writing, problems with bilateral use of the hands, and problems making change would preclude performance of these other jobs. (Tr. 609.)

Plaintiff's counsel asked Ms. Keene to consider a person who would require a sit/stand option and was limited in her use of hands as testified to by plaintiff. Ms. Keene testified that such a person could perform the work of surveillance systems monitor and credit checker. (Tr. 611.) Plaintiff's counsel then asked Ms. Keene to assume a person of plaintiff's age, education and work experience, and to further assume that the person was "[l]imited to

- 8 -

two hours sitting maximum capacity for an eight hour work day, two hours standing, and one hour of walking. With the ability to lift continuously 1 to 2 pounds, and frequently 5 pounds, occasionally 10 pounds." (Tr. 612.) Ms. Keene testified that such a person could not work on a full time basis inasmuch as she was limited in sitting, standing and walking to only five hours out of an eight-hour workday. In response to additional questioning, Ms. Keene testified that a person's ability to perform work would be affected by her need of more than three breaks on an unscheduled basis throughout the workday, especially if such breaks affected her production at work. (Tr. 611-12.)

### III.  Medical Records

On July 2, 2001, Dr. Joseph R. Ritchie wrote a letter to Dr. Michael Patterson in which he summarized plaintiff's foot and hand conditions:

> Donna Hal[t]on is a 36-year old female who is here for several problems. She has a long standing history of what sounds like carpal tunnel syndrome on the right side and it has been documented by nerve conduction velocity studies. She also has bilateral foot pain. Apparently, her left foot had a procedure done by another physician and this entailed a lateral incision, but it really did not give her much relief. She has had foot problems most of her life and is on her feet as a hairdresser. That is also when her carpal tunnel seems to bother her significantly.
>
> Physical examination today shows that her right hand has a positive Phalen's, a positive Tinel's and a median nerve compression test.

- 9 -

> Both feet show splay foot, but no significant arch problems or swelling about the area. Her x-rays show that she has had a subtalar arthrodesis on the left and it seems to be in good position. There are no real degenerative changes on the right and the talonavicular and subtalar joint seem to be in fairly good shape. She also has the radiographic criteria for a splay foot, however.

(Tr. 224.)

Dr. Ritchie diagnosed plaintiff with carpal tunnel syndrome and recommended that plaintiff undergo surgery inasmuch as conservative treatment seemed to be failing. Dr. Ritchie also diagnosed plaintiff with bilateral foot pain and opined that operative intervention would not give any appreciable relief. Dr. Ritchie recommended that plaintiff obtain well-fitted orthotics. (Tr. 224.)

Plaintiff visited Dr. Ritchie on August 1, 2001, and reported no improvement in her carpal tunnel. Plaintiff expressed interest in scheduling surgery for the condition. Plaintiff also complained of a continued burning sensation in her right foot and ankle. Examination showed a possible ganglion or cystic mass in the anterolateral aspect. Plaintiff's range of motion was noted to be reasonable with no peroneal or posterial tib problems. It was noted that plaintiff had not yet received her orthotics. An MRI of the ankle was ordered. (Tr. 223.)

MRI imaging of plaintiff's ankle performed on August 6, 2001, showed the palpable mass to correspond to a large amount of loculated fluid within the conjoined tendon sheath of the peroneus

brevis and longust. A probable tear of the peroneus brevis tendon was also noted. (Tr. 227.)

On August 21, 2001, plaintiff underwent surgery for her hand and ankle conditions, and specifically, right carpal tunnel release, right peroneal tenosynovectomy, and repair of longitudinal attritional tear of the peroneal brevis tendon. (Tr. 225-26.) Darvocet[2] was prescribed for plaintiff's pain. (Tr. 223.)

Plaintiff returned to Dr. Ritchie for follow up on August 24, 2001, who noted plaintiff not to experience numbness in her hand and to have full range of motion of the hand. Plaintiff reported no significant pain or discomfort with her ankle, and Dr. Ritchie recommended that plaintiff begin to put some weight on it. Plaintiff was instructed to return in ten days for follow up. (Tr. 222.)

Plaintiff returned to Dr. Ritchie on September 5, 2001, who noted plaintiff's recovery to be going well. Plaintiff was instructed to continue to wear her cast boot for two additional weeks with partial weight bearing, and to bear weight as tolerated thereafter. Plaintiff was instructed to return in one month. On October 3, 2001, plaintiff was instructed to continue to wear the cast boot due to swelling. Plaintiff was instructed to return in three to four weeks. (Tr. 222.)

Between October 4 and October 29, 2001, plaintiff

---

[2]Darvocet is used to relieve mild to moderate pain. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682325.html>.

participated in physical therapy for her ankle. Throughout the course of her therapy, plaintiff reported that she experienced increased pain related to her standing at work, but improvement was noted with continued therapy. (Tr. 99-130.)

Plaintiff returned to Dr. Ritchie on October 31, 2001, who noted plaintiff's recovery from ankle surgery to be coming along. It was noted that plaintiff experienced significant pain and discomfort if she stood for a long period of time. Dr. Ritchie advised that recovery from such surgery may take up to six months. Dr. Ritchie noted that underlying problems existed in both feet due to plaintiff's splay foot. Dr. Ritchie was hopeful that orthotics would help minimize plaintiff's discomfort. Dr. Ritchie also noted plaintiff to have no problems with carpal tunnel recovery and that she was doing well in that regard. (Tr. 221.)

Plaintiff visited Dr. Doug Howland on April 11, 2002, and complained of a cough, sore throat and ear pain. Dr. Howland diagnosed plaintiff with an upper respiratory viral infection, and medication was prescribed. (Tr. 136.) On April 26, 2002, plaintiff called Dr. Patterson's office requesting a refill of medication for her viral infection. On May 6, 2002, plaintiff called Dr. Patterson's office requesting that she be able to talk to Dr. Patterson regarding the pain in her throat, nose and ears, as well as a fever. It was noted that plaintiff did not have insurance. (Tr. 138.)

Plaintiff visited Dr. Patterson on May 7, 2002, in

relation to symptoms of sinusitis and bronchitis. Dr. Patterson prescribed Depo-Medrol,[3] Tequin (an antibiotic) and Advair[4] for plaintiff, and noted that a chest x-ray may be ordered if there was no improvement in one week. On May 9, 2002, plaintiff called Dr. Patterson's office complaining that her condition had not improved. (Tr. 135.)

Plaintiff visited Dr. Ritchie on July 24, 2002, and complained of a foot rash and itching. Dr. Ritchie opined that the condition may be recalcitrant athlete's foot and recommended that plaintiff see her primary care physician for the condition. (Tr. 132.)

On March 11, 2003, plaintiff called Dr. Patterson's office requesting an appointment for complaints of numbness and sharp, stinging pain in the toes of her right foot. It was noted that Dr. Patterson would see her in two weeks. (Tr. 134.)

Plaintiff visited Dr. Dwayne Helton on March 12, 2003, complaining of numbness and pain in her feet as a result of falling down some steps. Examination showed tenderness to palpation of the ankles bilaterally, with plantar fascia on the right. Some loss of pinprick sensation was also noted bilaterally. Dr. Helton

---

[3]Depo-Medrol is a corticosteroid used to relieve inflammation (swelling, heat, redness, and pain). <u>Medline Plus</u> (last Sept. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html</u>>.

[4]Advair is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and chronic obstructive pulmonary disease. <u>Medline Plus</u> (last revised Feb. 10, 2010) <<u>http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699063.html</u>>.

diagnosed plaintiff with onychodystrophia, bilateral foot pain and bilateral lower extremity paresthesias. Plaintiff was prescribed Darvocet and Anaprox,[5] and x-rays were ordered. Plaintiff was instructed to return in two weeks at which time steroid injections would be considered. (Tr. 194.)

An x-ray taken of plaintiff's left ankle on March 17, 2003, showed previous orthopedic fixation and mild soft tissue swelling. No fracture or dislocation was observed. (Tr. 179.) An x-ray taken of the left foot showed mild to moderate degenerative changes commensurate with age. (Tr. 178.) An x-ray taken of the right ankle was negative. (Tr. 177.) An x-ray taken of the right foot showed degenerative changes commensurate with age, mild hallux valgus deformity, bunion formation, and soft tissue swelling. (Tr. 176.)

Plaintiff returned to Dr. Helton on March 24, 2003, and reported that Darvocet did not significantly help her pain. Plaintiff reported her pain to range from a level three to a level ten and that it sometimes interfered with her activities of daily living. Dr. Helton noted the x-rays of plaintiff's feet to be normal. Plaintiff was diagnosed with chronic bilateral foot pain,

---

[5]Anaprox (Naproxen or Naprosyn) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis, and ankylosing spondylitis. <u>Medline Plus</u> (last reviewed Sept. 1, 2008) <u>&lt;http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html&gt;</u>.

and Roxicet and Hycotuss were prescribed.[6]  Plaintiff was instructed to return for follow up in one month.  (Tr. 193.)

Plaintiff returned to Dr. Helton on April 16, 2003, who noted blisters and ulcerations on plaintiff's toes with evidence of infection on the left.  It was noted that plaintiff had not yet had nerve condition studies done due to pre-certification problems.  X-rays were ordered of the toes as well as dopplar examination of the lower extremities.  Lamisil[7] was prescribed and plaintiff was instructed to return in three weeks for follow up.  (Tr. 190.)

On April 21, 2003, plaintiff visited Dr. Helton and complained of continued bilateral foot pain.  Dime-sized ulcerations were noted on plaintiff's toes with evidence of infection on the left.  Tenderness to palpation was noted about the ankles bilaterally with plantar fascia on the right.  Some loss of pinprick sensation was noted in the feet bilaterally.  It was also noted that plaintiff had hammertoes bilaterally.  Plaintiff was diagnosed with bilateral foot pain, ulcerations bilateral great toes, and oncychondystrophia.  Plaintiff was instructed to continue with her medication and to return in one month.  (Tr. 189.)

An x-ray taken of plaintiff's left toes on April 28,

_____

[6]Roxicet and Hycotuss are used to relieve moderate to severe pain.  <u>Medline Plus</u> (Roxicet) (last reviewed Feb. 1, 2009) <<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/meds/a682132.html>; (Hycotuss) (last revised Oct. 1, 2008)<<u>http://www.nlm.nih.gov/</u> medlineplus/druginfo/meds/a601006.html>.

[7]Lamisil is used to treat fungal infections.  <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/medlineplus/</u> druginfo/meds/a699061.html>.

2003, showed mild degenerative change involving the first metatarsophalangeal joint. (Tr. 174.) An x-ray of the right toes showed hallux valgus deformity with some degenerative change involving the first metatarsophalangeal joint. (Tr. 173.) Dopplar testing of the lower extremities showed no significant stenosis. (Tr. 172.)

Plaintiff visited Dr. Helton on October 6, 2003, and reported continued bilateral foot paresthesias. A new prescription for nerve conduction studies was prepared. (Tr. 188.) Nerve conduction studies of the lower extremities, performed on October 15, 2003, yielded normal results. (Tr. 203-04.)

Plaintiff was admitted to the emergency room at Des Peres Hospital on October 31, 2003, with complaints of severe pain in her left shoulder radiating to her neck. (Tr. 156-59.) Plaintiff reported that she was usually in good health and that her only medication was aspirin for headaches. (Tr. 157.) X-rays taken of plaintiff's cervical spine showed mild degenerative changes at C5-6, and to a lesser degree at C6-7. Disc space narrowing and small osteophytes were also seen. (Tr. 170.) Chest x-rays showed no active disease. (Tr. 169.) X-rays of the left arm showed a poorly formed glenoid of unknown etiology. (Tr. 168.) Plaintiff was given Toradol[8] and was discharged that same date in stable condition. (Tr. 158.) Plaintiff was diagnosed with acute left

---

[8]Toradol is used to relieve moderately severe pain. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html>.

shoulder and cervical pain, probably musculoskeletal in nature, and was given prescriptions of Skelaxin[9] and Motrin upon discharge. (Tr. 156.)

An ultrasound of plaintiff's abdomen performed on November 13, 2003, in response to plaintiff's complaints of abdominal pain yielded normal results. (Tr. 155.)

Plaintiff returned to Dr. Helton's office on December 31, 2003, for a tetanus booster after having stepped on a rusty nail. (Tr. 187.)

Plaintiff visited Dr. Helton on January 14, 2004, with complaints relating to acute sinusitis. (Tr. 186.)

Plaintiff visited Dr. Christopher Sloan on March 25, 2004, in relation to complications involving her right foot. Dr. Sloan noted plaintiff's past procedure in 2000 when she underwent calcaneal osteomy with subtalar joint fusion of the left foot secondary to a varus rotated heel position and subtalar joint degeneration. Dr. Sloan noted plaintiff to have improved with the procedure and to have been doing quite well. Dr. Sloan noted plaintiff's 2002 surgery involving her right foot, as performed by Dr. Ritchie. Plaintiff reported that she had some improvement with the surgery but that she nevertheless continued to experience pain and tenderness in the right foot along the lateral aspect secondary

---

[9]Skelaxin is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682010.html>.

to the varus rotated position of the heel and long standing history of mild cavus foot type. It was noted that plaintiff was currently taking no medications. Examination showed vesicular tinea infection of the right foot and onychomycosis of the right hallux. Dr. Sloan discussed a procedure similar to that performed on the left foot, and plaintiff determined to monitor the progression of the condition. Plaintiff was prescribed Feldene[10] for pain and tenderness in the right foot and peroneal tendons, and was instructed to return for re-evaluation in three weeks. (Tr. 216.)

Plaintiff visited Dr. Sloan on November 17, 2004, and complained of bilateral foot pain. Dr. Sloan noted there to be a noticeable varus position of plaintiff's right foot. Past surgery on plaintiff's left foot was noted. Examination showed pain in the medical bands of plaintiff's plantar fascia consistent with plantar fasciitis heel spur syndrome. Both of plaintiff's heels were injected, and Dr. Sloan determined to treat plaintiff's condition conservatively. (Tr. 215.)

On December 16, 2004, plaintiff underwent a consultative examination for disability determinations. (Tr. 139-44.) Dr. Sarwath Bhattacharya noted plaintiff's chief complaints to be of foot pain, hand pain, back pain, and migraine headaches. Dr. Bhattacharya reviewed plaintiff's medical records relating to her

---

[10]Feldene is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html>.

foot surgeries and carpal tunnel release. With respect to her feet, plaintiff reported that she continues to have pain in both feet, and Dr. Bhattacharya noted x-ray reports to show degenerative joint disease with hallux valgus deformity in both feet. (Tr. 139-40.) With respect to her hands, plaintiff reported bilateral carpal tunnel with continued cramping in the small joints of the right fingers even after surgery. Plaintiff reported having no weakness, tingling or numbness in the right hand. Plaintiff reported constant numbness in the second, third and fourth fingers of the left hand, but with no weakness or pain. With respect to her back, plaintiff complained of low back pain in the lumbosacral area. Plaintiff reported that she has had such pain for several years, and that it sometimes goes to the knees but without tingling or numbness in the feet. Plaintiff reported that she experiences stiffness with prolonged sitting. Plaintiff also reported having experienced migraine headaches for several years, from which she obtains relief with aspirin. Dr. Bhattacharya noted plaintiff's current medications to include Lamisil, Naproxen, Feldene, aspirin, and Darvocet. Plaintiff reported having had injections recently in both feet. (Tr. 140.) Physical examination showed plaintiff's gait to be within normal limits. Plaintiff did not use an assistive device for walking. Plaintiff was able to walk on her heels and toes, and was able to touch her toes. Plaintiff was able to squat. Dr. Bhattacharya noted there to be no paravertebral muscle spasm or tenderness. Straight leg raising was within normal

limits. Pedal pulses were well felt. Dr. Bhattacharya noted there to be no clubbing, cyanosis or edema of the extremities. Musculoskeletal examination showed plaintiff to have dexterous movement of her fingers for gross and fine manipulation. Phalen's test and Tinel's test for carpal tunnel were both negative. Hand grips were measured to be 5/5. Plaintiff had good range of motion about the upper and lower extremities, and an examination of joints showed no swelling, tenderness, pain, or redness. (Tr. 141-42.) Neurological examination showed no sensory loss and plaintiff's deep tendon reflexes were equal bilaterally. Upon conclusion of the examination, Dr. Bhattacharya opined that plaintiff had bilateral foot pain with a verus rotated heel and degenerative joint disease in the left foot, and degenerative disease and deformity of the hallux valgus in the right foot; bilateral carpal tunnel with cramping in the right fingers and numbness in the left fingers, but otherwise with full grip strength and no muscular or neurovascular compromise; low back pain with mostly stiffness and no radicular changes; and migraine headaches controlled with aspirin. (Tr. 142.)

Plaintiff returned to Dr. Sloan on March 30, 2005, and complained of pain and tenderness in the ankles bilaterally. Dr. Sloan noted there to be noticeable swelling as well as noticeable varus position of the right heel. Arthroscopy of both ankles was

planned, and plaintiff was prescribed Voltaren[11] to reduce pain and tenderness.  (Tr. 214.)

On April 11, 2005, plaintiff visited Dr. Helton and complained of bilateral foot pain.  It was noted that plaintiff was scheduled to have foot surgery.  Plaintiff also wanted to discuss weight loss.  Plaintiff was diagnosed with morbid obesity and Adipex[12] was prescribed.  Plaintiff was instructed to return in thirty days for follow up.  (Tr. 184.)

On April 13, 2005, plaintiff underwent left ankle arthroscopy with synovectomy in response to plaintiff's complaints of left ankle pain.  Plaintiff was prescribed Percocet[13] upon discharge.  (Tr. 151-53.)

Plaintiff visited Dr. Sloan on April 21, 2005, for follow up of her recent surgery.  Dr. Sloan noted plaintiff to be making steady progress with healing.  Plaintiff showed no significant pain or tenderness on range of motion exercises.  Plaintiff reported a decrease in pain and tenderness about the left ankle.  Dr. Sloan determined for plaintiff to increase her activity.  Plaintiff was

---

[11]Voltaren is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis.  Medline Plus (last revised Dec. 1, 2009) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html>.

[12]Adipex decreases a person's appetite and is used to help reduce weight.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682187.html>.

[13]Percocet is used to relieve moderate to severe pain.  Medline Plus (last reviewed Feb. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>.

instructed to return in two weeks for follow up. (Tr. 213.)

Plaintiff returned to Dr. Sloan on May 5, 2005, who noted plaintiff to be making steady progression in healing. Arthroscopy of the right ankle was scheduled. (Tr. 212.)

On May 26, 2005, plaintiff underwent right ankle arthroscopy with debridement. (Tr. 147.)

Plaintiff returned to Dr. Sloan on June 2, 2005, for follow up of her recent surgery and reported no substantial pain or tenderness. Dr. Sloan noted good range of motion and that plaintiff's right ankle was stable. Plaintiff reported reduced pain and tenderness in the left foot as well. Dr. Sloan opined that plaintiff was doing quite well with the bilateral ankle arthroscopies. (Tr. 211.)

Plaintiff returned to Dr. Sloan on June 28, 2005, who ordered physical therapy for plaintiff's ankles. (Tr. 206.)

An x-ray taken of plaintiff's right hip on July 17, 2005, yielded results within normal limits. (Tr. 202.) An x-ray of the right knee showed degenerative osteoarthritis. (Tr. 201.) X-rays of the lumbar spine showed bilateral L5 pars defects and discogenic degenerative disease of the L5-S1. There was no evidence of spondylolisthesis. (Tr. 200.)

Plaintiff visited Dr. Helton's office on July 19, 2005, and reported her involvement in a motor vehicle accident on July 17, 2005. Plaintiff reported pain in her lower back and right knee. Plaintiff also reported onset of headache pain which was

worsening.  A CT scan of the head was ordered.  (Tr. 183.)

A CT scan of plaintiff's brain, performed on July 21, 2005, yielded negative results.  (Tr. 199.)  An MRI scan of plaintiff's brain performed in response to plaintiff's complaints of left-sided weakness, numbness and tingling, showed two, non-specific small areas of bright signal on the T2 weighted images in the deep white matter in the left frontal lobe.  Otherwise, the MRI was unremarkable.  (Tr. 197.)  A CT scan of the cervical spine performed in response to plaintiff's complaints of neck pain showed disc space narrowing at the C5-6 level.  (Tr. 198.)

On July 22, 2005, plaintiff underwent a carotid duplex sonography in response to a transient ischemic attack/small infarct with left-sided sensory problems.  (Tr. 195.)  The sonography showed very minimal plaque formation without significant stenosis. (Tr. 196.)

On July 26, 2005, plaintiff failed to appear for a scheduled appointment with Dr. Sloan.  (Tr. 206.)

Plaintiff returned to Dr. Helton's office on August 4, 2005, and complained of lightheadedness and neck and back pain.  It was noted that plaintiff had started physical therapy for her pain. Physical examination showed tenderness about the paraspinal musculature in the cervical and lumbar area.  Plaintiff was diagnosed by Connor Andreano-Young (APRN, BC) with lumbar and cervical strain and status-post motor vehicle accident with

concussion. Soma[14] and Darvocet were prescribed. (Tr. 182.)

On November 8, 2005, Dr. Sloan's office called plaintiff to inform her that her insurance was no longer taken by the office. (Tr. 206.)

At the request of plaintiff's counsel, plaintiff underwent a consultative examination on August 31, 2006. (Tr. 232-38.) Dr. John E. Emmons noted plaintiff's complaints to include chronic bilateral foot pain and burning sensations due to degenerative joint disease; carpal tunnel syndrome from which she experiences intermittent numbness in the left hand and forearm, extending to the left shoulder at times; arthritic pains in the right hand; and pain in the lumbar spine and knees which plaintiff attributed to her altered gait due to foot pain. (Tr. 232-33.) Plaintiff reported that she had reduced her working hours to one-to-two days a week, one-to-three hours a day. Plaintiff reported that she had splints for both wrists and custom orthotics for her shoes. Plaintiff's current medication was noted to be aspirin for pain. (Tr. 233.) Plaintiff reported that she experiences frequent twitching of the calf and thigh muscles, and that she experiences intermittent paresthesias and dysesthesias in the left arm, the toes of the right foot, and the ankles bilaterally. Plaintiff reported arthralgia in the knees, ankles and feet, and reported

---

[14]Soma is a muscle relaxant used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. <u>Medline Plus</u> (last reviewed Sept. 1, 2008)<<u>http://www.nlm.nih.gov/</u>medlineplus/druginfo/meds/a682578.html>.

occasional swelling in the knees. (Tr. 234.) Dr. Emmons noted plaintiff to exhibit some evidence of a depressed mood, and the Prime-MD test was administered. From the results of the test, Dr. Emmons diagnosed plaintiff with major depression, insomnia, dysthymia, and generalized anxiety disorder. (Tr. 235.) Physical examination of the back showed moderate myospasm, tenderness and guarding at the L2 level through S1 over the paraspinal musculature bilaterally. Tenderness was also noted at the subtrochanteric bursa bilaterally. No apparent osseous deformities or other scolioses were noted. The thoracic kyphosis and cervical and lumbar lordosis were within normal limits. Examination of the extremities showed moderate tenderness with palpation over the right wrist, with exacerbation on passive range of motion. Acute tenderness was noted on passive and active range of motion testing of the ankles bilaterally. Peripheral pulses were decreased bilaterally. Grip strength and strength of the upper and lower extremities were +5/5 bilaterally. Deep tendon reflexes were noted to be reduced bilaterally, and mildly decreased pinprick sensitivity was noted in the lower extremities. Dr. Emmons noted plaintiff's gait to be moderately abnormal with a limp favoring both feet. Plaintiff was unsteady with heel-to-toe walk. Plaintiff was able to squat fully and arise with some difficulty, while holding the exam table for balance. Plaintiff was able to kneel alternately on the left and right knees and arise, holding the exam table for balance. (Tr. 236.) Plaintiff had full range

of motion about the shoulders, elbows, and wrists. Plaintiff was able to fully extend the hands, make a fist, and oppose the fingers with the thumbs bilaterally. Plaintiff had full range of motion about the hips, ankles, cervical spine, and lumbar spine. Plaintiff had limited range of motion about the knees, and limited straight leg raising. (Tr. 237.) Upon conclusion of the examination, Dr. Emmons diagnosed plaintiff with degenerative joint disease, bilateral ankles; status post capsulitis, right ankle; bilateral L5 pars defect; degenerative disc disease of L5-S1 with tenderness and myospasm bilaterally; degenerative osteoarthritis, right knee; mild degenerative changes at C5-6 and C6-7; status post right hallux valgus; major depressive disorder; generalized anxiety disorder; dysthymia; and insomnia. (Tr. 238.) Dr. Emmons concluded that plaintiff was able to

> sit for 30 to 45 minutes, stand for 30 minutes or walk for 30 minutes before needing to change positions or rest, that she is able to climb one flight of steps or descend two flights of steps slowly and that she is able to stoop occasionally and reach above her head frequently. . . . [S]he is able to travel unaccompanied for 30 to 45 minutes before needing to stop and rest, and . . . is able to perform fine motor tasks with both hands for a similar length of time. . . . [S]he is able to tolerate dust, fumes and loud noises frequently, and . . . is able to see, speak and hear adequately to function in a normal environment.

(Tr. 238.)

In a Medical Source Statement completed September 11,

2006, Dr. Emmons opined that plaintiff could sit a total of two hours in an eight-hour workday, stand for a total of two hours in an eight-hour workday, and walk for a total of one hour in an eight-hour workday. Dr. Emmons opined that plaintiff could continuously lift and carry one to two pounds; frequently lift and carry five pounds; occasionally lift and carry ten pounds; but could never lift and carry twenty pounds. Dr. Emmons opined that plaintiff was limited in balancing, even when standing or walking on even terrain. Dr. Emmons opined that plaintiff could occasionally stoop and frequently reach above her head. Dr. Emmons opined that plaintiff had no limitations with her hands, vision or with communication/hearing. Dr. Emmons reported that plaintiff's lumbar pain, bilateral knee pain, and bilateral foot pain were medically determinable impairments expected to produce pain. Dr. Emmons reported plaintiff's pain to be constant, as objectively indicated by muscle spasm and guarding/apprehension; and as subjectively indicated by complaints of pain, sleeplessness, irritability, and grimaces. Dr. Emmons opined that plaintiff should use a cane but further opined that plaintiff's impairments did not require her to lie down or take a nap during a normal workday. Dr. Emmons opined that plaintiff's impairments would require her to take a break every thirty to sixty minutes in an eight-hour workday due to pain in her feet, knees and lumbar spine. Dr. Emmons opined that the onset of plaintiff's limitations occurred in 2000 and that such limitations have lasted or were

expected to last twelve continuous months.  Dr. Emmons opined that plaintiff could not work full time in her profession as a hairdresser due to her inability to remain on her feet for an extended length of time.  (Tr. 239-41.)

Plaintiff visited Comtrea for psychological counseling on October 5, 2006.  (Tr. 503.)  Plaintiff returned to Comtrea on October 12, 2006, at which time planning was begun for treatment.  (Tr. 502.)  On October 19, 2006, plaintiff reported to Comtrea that she had had a good week and things seemed brighter.  It was noted that plaintiff was invested in the counseling process, and continued treatment was planned.  (Tr. 501.)  Plaintiff reported continued improvement on October 26, 2006, although it was noted that financial circumstances still worried her.  (Tr. 500.)  Plaintiff was more tearful at Comtrea on November 9, 2006, and reported frustration with personal relationships and with continuing financial strain.  (Tr. 499.)

Plaintiff visited Dr. Deborah A. Depew at Cedar Hill Family Medicine on November 10, 2006, complaining of right low back pain in the sacroiliac region.  Plaintiff reported having such pain for three weeks.  It was noted that plaintiff had been seeing a chiropractor.  Dr. Depew noted plaintiff to be obese.  Physical examination showed tenderness in the right sacroiliac joint.  Straight leg raising was negative.  Dr. DePew diagnosed plaintiff with right sacroiliitus.  Plaintiff was given samples of Skelaxin and was instructed to take Naprosyn.  Plaintiff was also instructed

to take Tylenol for pain. Dr. DePew opined that plaintiff should have an x-ray, noting that a CT scan or MRI would be ideal; but it was also noted that plaintiff had no insurance and was averse to more testing. Plaintiff was instructed to return to the office if there was no improvement in her condition. On November 14, 2006, plaintiff called Dr. Depew's office requesting additional samples of Skelaxin, reporting that Skelaxin helped her condition. (Tr. 479.)

Plaintiff cancelled an appointment scheduled for November 16, 2006, at Comtrea. (Tr. 498.)

In a "Disability Certificate" dated November 22, 2006, Dr. Depew wrote that plaintiff was seen on November 10, 2006, for sacroiliitus and was unable to return to work. (Tr. 242.)

On November 24, 2006, plaintiff reported to Comtrea that she did not have her usual feelings of sadness, excessive worry and irritable mood. Criteria for discontinuation of services were discussed. (Tr. 497.)

On November 30, 2006, plaintiff failed to appear for a scheduled appointment at Comtrea. (Tr. 496.) On December 7, 2006, plaintiff reported to Comtrea that she had to work a lot more to earn money to keep her home and to make car payments. It was noted that plaintiff's increased stressors resulted in increased crying, sleeplessness and irritability. (Tr. 495.) On December 14, 2006, plaintiff continued in her reports of excessive stress and worry. (Tr. 494.)

Plaintiff returned to Dr. Depew on December 27, 2006, with complaints relating to sinusitis. (Tr. 478.)

Plaintiff cancelled her appointments with Comtrea which were scheduled for December 28, 2006, and January 4, 2007. (Tr. 493.)

Plaintiff returned to Comtrea on January 11, 2007, and reported improvement in her financial situation. Plaintiff reported continued, but reduced, crying spells as well as fitful sleep and staying in bed or on the couch longer than normal. (Tr. 491.)

Plaintiff failed to appear for an appointment at Comtrea scheduled for January 25, 2007. (Tr. 490.) Plaintiff cancelled her appointment with Comtrea scheduled for February 1, 2007. (Tr. 489.)

On February 15, 2007, plaintiff underwent psychiatric evaluation at Comtrea. (Tr. 487-88.) Plaintiff's chief complaints were noted to be depression, anxiety and poor sleep. It was noted that plaintiff was a cosmetologist, owned her own business and worked long hours daily. It was noted that plaintiff had no insurance. (Tr. 487.) Dr. J.C. daSilva noted plaintiff to be very obese and walking with difficulty. Dr. daSilva noted no signs of any major disorder in plaintiff's thought processes. Plaintiff seemed hopeful with psychotherapy but was distrustful of medication. Plaintiff reluctantly agreed to a trial of medication as advised by her therapist. Dr. daSilva diagnosed plaintiff with

major depression, recurrent, and assigned a Global Assessment of Functioning (GAF) score of 60.[15] Plaintiff was instructed to continue with her current psychotherapy, and Trazodone[16] was prescribed for plaintiff to take at bedtime. Plaintiff was instructed to return in three weeks. (Tr. 488.)

Plaintiff returned to counseling at Comtrea on February 22, 2007, and reported feeling somewhat better, including more restful sleep. Plaintiff reported that she had not begun her medication yet because she was scared to take it. (Tr. 513.) Plaintiff cancelled an appointment at Comtrea which was scheduled for March 1, 2007. (Tr. 512.)

Plaintiff returned to Comtrea on March 8, 2007, and reported no change in her symptoms. It was noted that plaintiff had not begun her medication yet. (Tr. 511.) Plaintiff cancelled appointments at Comtrea which were scheduled for March 15 and 22, 2007. (Tr. 509, 510.)

Plaintiff returned to Comtrea on March 29, 2007, and reported that she had experienced a lot of stress during the

_____

[15]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

[16]Trazodone is used to treat depression. Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

previous two weeks. Plaintiff expressed continued struggle with the decision whether to begin taking the prescribed medication, noting past problems with other anti-depressants. (Tr. 508.) On April 5, 2007, plaintiff continued to report struggles with her decision whether to begin the medication. It was noted that plaintiff's level of interest in working had improved, as well as her interest in engaging in social activities. It was noted that plaintiff would most likely begin her medication that week. (Tr. 507.)

Plaintiff cancelled her appointment with Comtrea which was scheduled for April 12, 2007. (Tr. 506.) On April 26, 2007, plaintiff reported that she was highly distressed given the apparent lack of change in her life and lack of progress. (Tr. 505.)

Plaintiff visited Dr. Helton on April 27, 2007, with complaints of a toothache. Plaintiff was prescribed an antibiotic and Percocet for pain. (Tr. 556.)

Plaintiff cancelled appointments at Comtrea which were scheduled for May 4 and 10, 2007. (Tr. 504.)

In May 2007, counselors at Comtrea reported that plaintiff had recurrent depression, having originally presented to Comtrea with excessive worry about financial difficulties and family problems. It was noted that plaintiff worked full time and was struggling financially. It was noted that plaintiff was "functioning fairly well at this point but is frustrated that she

feels like she has not progressed much, but others notice a difference in her." Plaintiff was diagnosed with major depressive disorder and was assigned a GAF score of 54. (Tr. 284.)

On July 5, 2007, plaintiff underwent a consultative physical examination for disability determinations. (Tr. 519-25.) Plaintiff's complaints were noted to include left ankle reconstruction and replacement; right ankle surgery; degenerative joint disease; degenerative disc disease; and left carpal tunnel syndrome. Dr. Brenda Buckley noted plaintiff not to currently have a primary care physician. With respect to her ankles, plaintiff reported constant pain at a level of five or six in the morning, reducing to a level three or four during the day. Plaintiff reported that with increased activity, the pain rises to a level eight or nine. Plaintiff reported that the pain wakes her at night and that previous physical therapy did not help the condition. Plaintiff reported that she cannot stand for long periods of time and only works three hours a day, two days a week because of her inability to stand. Plaintiff reported that she cannot sit for long periods because her ankles swell. Plaintiff reported difficulty with walking. With respect to degenerative joint disease, plaintiff reported that she has had pain in her knees and hips since her ankle problems developed, but that she has not had treatment or x-rays for the condition. Plaintiff attributed the pain to arthritis and reported the pain to be present most of the time. (Tr. 519.) With respect to degenerative disc disease,

plaintiff reported that she has had pain in her back since her ankle problems developed, but that she has not had treatment or x-rays for the condition. Plaintiff attributed the pain to arthritis and the way she walks. With respect to carpal tunnel syndrome, plaintiff reported that she experiences constant numbness in the fingers of her left hand and that the numbness wakes her at night. Plaintiff reported that she wears a brace on her left hand when she has a bad day. Plaintiff was not currently taking any medication. (Tr. 520.) Dr. Buckley noted that plaintiff ambulated with slight difficulty, but that she was able to get on and off the exam table and get up from a chair without difficulty. (Tr. 521.) Examination of the extremities showed 2+ pulses. Plaintiff had 2+ edema to the knees. Tenderness to palpation was noted over the lumbar spine, bilateral hips and right knee. Plaintiff's strength was measured to be 5/5 bilaterally. Plaintiff was able to make a fist, lay her hand flat, and oppose her fingers and thumb. No muscle atrophy was noted. Tinel's test was negative. Phalen's test was positive on the left. Straight leg raising was negative at eight-five degrees. Plaintiff could not walk on her heels or toes. Plaintiff was able to heel-to-toe walk. Plaintiff was able to squat with assistance. No muscle atrophy, muscle spasming or muscle tenderness was noted about the lower extremities. Neurological testing showed normal sensation. Deep tendon reflexes were 1+. Upon conclusion of the examination, Dr. Buckley diagnosed plaintiff with left ankle reconstruction and replacement; right

ankle arthroscopy with ligament repair; degenerative joint disease; degenerative disc disease; left carpal tunnel syndrome; and obesity. Dr. Buckley opined that plaintiff was able to stand for two-to-four hours in an eight-hour workday and sit for two-to-four hours in an eight-hour workday. Dr. Buckley opined that plaintiff did not need an assistive device. (Tr. 522.) Dr. Buckley opined that plaintiff could not do any prolonged walking. (Tr. 522-23.) Dr. Buckley further opined that plaintiff was not limited in her ability to lift, carry, handle objects, hear, speak, or travel. (Tr. 523.)

X-rays were taken on July 26, 2007, for disability determinations. X-rays of plaintiff's right ankle showed calcaneal spur and soft tissue swelling. X-rays of the right knee showed minimal osteoarthritis with slight narrowing of the joint space, patellar spur, and small joint effusion. (Tr. 531-32, 534-37.)

On August 9, 2007, psychologist Marsha Toll with disability determinations completed a Psychiatric Review Technique Form in which she opined that plaintiff suffered from major depressive disorder but that such impairment was not severe. Ms. Toll opined that plaintiff was mildly limited in maintaining concentration, persistence or pace on account of the impairment, but was not limited in her activities of daily living or in maintaining social functioning. Ms. Toll further opined that plaintiff did not suffer repeated, extended episodes of decompensation. (Tr. 558-68.) To support her conclusion that

plaintiff's mental impairment was not severe, Ms. Toll noted that despite plaintiff's impairment, she "has managed to handle all personal issues including meeting with insurance agents, paying bills, and working as a self-employed individual[.]" (Tr. 568.)

On August 9, 2007, medical consultant D. McWilliams with disability determinations completed a Physical Residual Functional Capacity Assessment in which s/he opined that plaintiff could occasionally lift and carry ten pounds; frequently lift and carry less than ten pounds; stand and or walk for a total of at least two hours in an eight-hour workday; and sit for a total of about six hours in an eight-hour workday. Consultant McWilliams opined that plaintiff was unlimited in her ability to push and/or pull. Consultant McWilliams further opined that plaintiff could occasionally climb, kneel, crouch, and crawl, and could frequently balance and stoop. Consultant McWilliams opined that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 569-74.)

On September 6, 2007, Comtrea called plaintiff to inquire as to whether she was interested in continuing with therapy. (Tr. 285.)

Plaintiff visited Dr. Helton on February 27, 2008, with complaints of ear pain, headaches and a cough. Plaintiff was prescribed Amoxil and was instructed to return as needed. (Tr. 555.)

Plaintiff visited the emergency room at St. Anthony

Medical Center on May 21, 2008, complaining of abdominal pain with nausea and vomiting. It was noted that plaintiff currently took no medication. A CT scan of the abdomen and pelvis yielded negative results. Plaintiff was discharged that same date and was advised to follow up with Dr. Lee. (Tr. 540-52.)

Plaintiff was discharged from treatment at Comtrea on May 27, 2008, upon her decision to end treatment. It was noted that no current treatment plan was in place. Upon discharge, plaintiff was diagnosed with major depressive disorder and was assigned a GAF score of 54. (Tr. 283-84.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act on January 1, 2003, and remained so insured through the date of the decision. The ALJ also found that plaintiff had not engaged in substantial gainful activity since January 1, 2003. The ALJ found plaintiff's severe impairments to be degenerative joint and disc disease, and a history of multiple lower extremity surgeries, but that plaintiff's condition did not meet or medically equal one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's allegations not to be fully credible. The ALJ determined that plaintiff had the residual functional capacity (RFC) to perform the full range of sedentary work, that is, lift or carry ten pounds occasionally and less than ten pounds frequently, sit about six hours in an eight-hour day, and stand and/or walk a total of about

two hours in an eight-hour day.  The ALJ found plaintiff unable to perform her past relevant work.  Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that plaintiff was able to perform work existing in significant numbers, and specifically, surveillance system monitor, credit checker, and document preparer.  The ALJ thus found plaintiff not to be under a disability.  (Tr. 264-71.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion.  <u>Johnson</u> <u>v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v.</u> <u>Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  <u>Coleman</u>, 498 F.3d at 770;

Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff argues that the ALJ's RFC determination is flawed inasmuch as no medical evidence exists in the record to support the determination. Plaintiff also contends that the ALJ erred in finding plaintiff's hand and wrist conditions not to constitute severe impairments. Finally, plaintiff claims that the ALJ erred in relying on vocational expert testimony to find plaintiff not disabled inasmuch as the limitations found by the ALJ did not match those in the hypothetical posed to the expert.

A.   Severe Impairment

Plaintiff claims that the ALJ erred at Step Two of the analysis when he determined plaintiff's hand and wrist conditions, and specifically, her carpal tunnel syndrome, not to constitute

severe impairments.  For the following reasons, the ALJ did not err in this determination.

Under Step Two of the Commissioner's five-step evaluation process, a claimant has the burden of establishing that her impairment significantly limits her ability to perform basic work activities, that is, more than minimally impacts her ability to work.  <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001); <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996).  Substantial evidence on the record as a whole supports the ALJ's finding that the plaintiff failed to meet her burden here with respect to her carpal tunnel syndrome.

As noted by the ALJ, a review of the evidence on the record as a whole shows plaintiff to have undergone right carpal tunnel release in 2001 with no medical evidence showing there to have been a recurrence of limiting symptoms thereafter.  Despite plaintiff's multiple visits to treating physicians regarding complaints of foot and ankle pain, sinusitis and other ailments, plaintiff's complaints of symptoms relating to carpal tunnel syndrome were made only to consulting physicians Bhattacharya, Emmons and Buckley.  Notably, the examinations performed by these consulting physicians consistently showed plaintiff to have full grip strength, good range of motion, and no sensory loss. Examinations also showed plaintiff to have the ability to make a fist, fully extend her hands, and oppose her fingers and thumb. Drs. Emmons and Buckley both specifically opined that plaintiff had

no limitations with her hands. The lack of any medically necessary restrictions in the record supports the ALJ's finding that plaintiff's carpal tunnel syndrome was not severe. <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 852 (8th Cir. 2000).

The record contains no medical evidence to support plaintiff's claim that carpal tunnel syndrome more than minimally affected her ability to perform basic work activities. <u>See</u> 20 C.F.R. § 404.1508 (to be considered as a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."). Because plaintiff failed to meet her burden of demonstrating that her carpal tunnel syndrome constituted a severe impairment, the ALJ did not err in his failure to so find. <u>Mittlestedt</u>, 204 F.3d at 852.

B. <u>Medical Evidence of RFC</u>

In his written decision, the ALJ determined that plaintiff retained the physical RFC to engage in the full range of sedentary work, that is, to lift or carry ten pounds occasionally and less than ten pounds frequently, sit about six hours in an eight-hour day, and stand and/or walk a total of about two hours in an eight-hour day. Plaintiff claims that there is no medical evidence in the record to support this determination.

Residual functional capacity is what a claimant can do despite her limitations. <u>Dunahoo v. Apfel</u>, 241 F.3d 1033, 1039 (8th Cir. 2001). The ALJ bears the primary responsibility for

assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. § 404.1545(a). A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination. Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002); Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id. An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect her current ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

Here, the ALJ found that plaintiff had the RFC to perform the full range of sedentary work, specifically finding plaintiff

able to sit about six hours in an eight-hour workday. (Tr. 267.)[17] The only evidence of record demonstrating that plaintiff can sit up to six hours in an eight-hour workday, however, is contained within the RFC checklist completed by a non-examining consultant for disability determinations. An ALJ's RFC determination based on nothing more than such an opinion from a non-examining consultant cannot be said to be supported by substantial evidence on the record as a whole. Nevland, 204 F.3d at 858. This is especially true here where the opinion runs counter to and is inconsistent with *medical* evidence on the record obtained from examining physicians based upon physical examinations, objective findings and diagnostic tests.

Dr. Emmons examined plaintiff in August 2006, during which physical examination of the back showed moderate myospasm, tenderness and guarding at the L2 level through S1, as well as tenderness at the subtrochanteric bursa. Dr. Emmons diagnosed plaintiff with bilateral L5 pars defect and degenerative disc disease of L5-S1 with tenderness and myospasm, and opined that plaintiff was limited to sitting for a total of two hours in an eight-hour workday. Dr. Buckley examined plaintiff in July 2007,

---

[17]"Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." *Dictionary of Occupational Titles* 379.367-010 (Surveillance-System Monitor) (rev. 4th ed. 1991). See 20 C.F.R. § 404.1567 (2008) (the physical exertion requirements of work, as defined in the regulations, have the same meaning as they have in the *Dictionary of Occupational Titles*).

during which physical examination of the back showed tenderness to palpation over the lumbar spine and hips. Dr. Buckley diagnosed plaintiff with degenerative disc disease and opined that plaintiff was limited to sitting for two-to-four hours in an eight-hour workday. X-rays of the spine taken in 2005 showed bilateral L5 pars defects and discogenic degenerative disease of the L5-S1.

In his written decision, the ALJ determined to accord slight weight to Dr. Emmons' opinion regarding plaintiff's limited ability to sit for the reason that such opinion was "refuted by the claimant's ability to work as a cashier for nearly a year, in 2007 and 2008." (Tr. 269.) As testified to by plaintiff, however, the cashier position was a standing position, during which she could occasionally sit, and plaintiff could only perform the work for two hours. The ALJ also determined to accord slight weight to Dr. Buckley's opinion limiting plaintiff to sitting for no more than four hours for the reason that such opinion was "not supported by the exam results, and [was] inconsistent with the record as a whole." (Tr. 269-70.) In making this cursory statement, the ALJ provides no explanation as to how Dr. Buckley's opinion was not supported by exam results contained in the record as a whole, with such exam results showing bilateral L5 pars defects and discogenic degenerative disease of the L5-S1; moderate myospasm, tenderness and guarding at the L2 level through S1; tenderness at the subtrochanteric bursa; and tenderness to palpation over the lumbar spine and hips. To the extent the ALJ cites to inconsistencies in

the record, the ALJ relies only on plaintiff's ability to work as a cashier in 2007 and 2008, which, according to the ALJ, "indicates a good ability to sit"; and by plaintiff's ability to drive, watch television, and sit while visiting with friends. (Tr. 270.) Assuming *arguendo* that these perceived inconsistencies provide a sufficient basis upon which to accord slight weight to the examining physicians' opinions as to plaintiff's limited ability to sit, it cannot be said that such inconsistencies constitute *medical* evidence upon which the ALJ could base his RFC finding regarding plaintiff's ability to sit. Plaintiff's ability to work two-hour shifts as a cashier primarily in a standing position and to sit while driving, watching television and visiting with friends is not *medical* evidence demonstrating that plaintiff can sit up to six hours in a work like setting. "The residual functional capacity of a claimant 'is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982)).

The only medical evidence contained within the record that addresses the claimant's ability to function in the workplace are those opinions from Drs. Emmons and Buckley in which they opine, *inter alia*, that plaintiff's impairments resulted in a limitation in her ability to sit during an eight-hour workday, and specifically, that she could sit for no longer than two-to-four

hours in such a day. The ALJ's determination to discount these opinions left the record devoid of any substantial medical evidence upon which the ALJ could base an RFC finding regarding plaintiff's ability to sit. The RFC checklist completed by the non-examining consultant does not constitute medical evidence upon which the ALJ could rely, alone, in determining plaintiff to have the RFC to sit about six hours in an eight-hour workday. Because the ALJ's RFC determination with respect to plaintiff's ability to sit is not supported by some medical evidence in the record, the ALJ's determination is not supported by substantial evidence on the record as a whole and cannot stand.

C.    Vocational Expert Testimony

        In determining plaintiff not to be disabled, the ALJ relied on the testimony of the vocational expert in which she opined that plaintiff could perform sedentary work in the national economy, such as surveillance system monitor, credit checker, and document preparer. This opinion was based upon the ALJ's hypothetical in which the vocational expert was asked to assume that plaintiff had the RFC to perform the full range of sedentary work.[18] As discussed supra at Section V.B, this RFC determination

_____

        [18]The undersigned notes that the ALJ's generalized question to the vocational expert to assume that plaintiff could perform sedentary work is in itself "problematic" because such questions "often result in a failure to create a record showing that the vocational expert considered the particular individual disabilities of the claimant in evaluating [her] ability to perform alternative employment." Gulliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005) (internal quotations marks and citation omitted).

- 48 -

is not supported by substantial evidence on the record as a whole. Because the ALJ's RFC determination was flawed, his reliance on vocational expert testimony based on this flawed determination was error. A vocational expert's testimony given in response to a hypothetical question based upon a faulty determination of a claimant's RFC cannot constitute sufficient evidence that the claimant is able to engage in substantial gainful employment. Lauer, 245 F.3d at 706.

Therefore, for all of the foregoing reasons, the undersigned finds that the Commissioner's decision is not supported by substantial evidence on the record as a whole and this cause should be remanded for further consideration. It is inappropriate to award plaintiff benefits at this time because the current record does not conclusively demonstrate that plaintiff is disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and that the cause be remanded to the Commissioner for further proceedings.

Judgment shall be entered accordingly.

_____
UNITED STATES MAGISTRATE JUDGE


Dated this _15th_ day of March, 2010.